**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **NANCIE FIMBEL** and **CONSTANCE NICKEL**, | : |
| | : |
| Plaintiffs, | : |
| v. | :  Civ. Action No.: 14-1915 (FLW)(DEA) |
| | : |
| **FIMBEL DOOR CORPORATION, EDWARD FIMBEL, JR**, **EDWARD FIMBEL, III, FIMBEL ARCHITECTURAL DOOR SPECIALTIES, LLC**, and **JEFFRY DEAL**, | :  OPINION |
| | : |
| Defendants. | : |

**WOLFSON**, **United States District Judge:**

The instant case involves claims by Plaintiffs Nancie Fimbel and Constance Nickel (collectively, "Plaintiffs"), minority shareholders in Fimbel Door Corporation ("FDC"), against FDC, FDC's president, certain FDC directors and former employees, and Fimbel Architectural Door Specialties ("FADS"), for, *inter alia*, violation of Plaintiffs' rights as FDC shareholders, fraud, and breach of fiduciary duty. Presently before the Court is a motion by Plaintiffs to appoint a receiver to operate FDC during the pendency of the litigation, or in the alternative, a special fiscal agent to supervise the business of FDC. Defendants FDC, FADS, Edward Fimbel, Jr., Edward Fimbel, III, and Jeffrey Deal (collectively, "Defendants") oppose the motion. Having reviewed the record and held oral argument on the matter, for the reasons set forth below, the Court appoints a special fiscal agent to supervise the business of FDC.

1

## I.     Procedural and Factual Background

FDC is a closely-held and family-operated New Jersey corporation that specializes in the manufacturing of garage doors. Verification of Edward Fimbel, Jr. ("Fimbel, Jr. Ver.") ¶¶ 5-17. Plaintiffs are minority shareholders in FDC, collectively holding approximately 14% of its stock. Mr. Fimbel, Jr. is the president and a director of FDC, as well as the uncle of both Plaintiffs. Fimbel, Jr. Ver. at ¶ 1; Supp. Cert. of Counsel Kristin V. Hayes ("Hayes Supp. Cert.") Ex. C. Mr. Fimbel, Jr.'s son, Mr. Fimbel, III, is the founding member and chief executive officer of FADS, as well as the holder of the largest block of shares in FDC and a director of FDC. Hayes Supp. Cert. Exs. C, E, F at ¶¶ 22-23, and G at ¶ 13. Mr. Deal was formerly an employee of FDC, and is now a member and the vice president of FADS. Hayes Supp. Cert." Exs. E, F, and G at ¶¶ 9, 13; Verification of Edward Fimbel, Jr. ("Fimbel, Jr. Ver.") Ex. B. at 56.

Plaintiffs bring this action against Defendants, alleging, *inter alia*, that Mr. Fimbel, Jr., as president of FDC, has systematically denied Plaintiffs and other shareholders information relating to FDC; has grossly mismanaged the assets of the company, through his actions, including an approximately $1,000,000 failed investment in solar panels, unsanctioned by FDC's shareholders; and has appropriated assets from FDC to FADS for the benefit of his son, Mr. Fimbel, III. Am. Compl. ¶¶ 20, 25-33, 41-47.

On March 26, 2014, Plaintiffs filed a Complaint in federal court, asserting diversity jurisdiction. On April 11, 2014, Plaintiffs amended their Complaint to include further allegations regarding the diversity of citizenship of Plaintiffs and Defendants.[1] On May 28, 2014, Defendants

---

[1] According to the Amended Complaint, Ms. Fimbel is domiciled in Dubai, United Arab Emirates, and Ms. Nickel is domiciled in New York. Defendants are all domiciled in New Jersey. Am. Compl. ¶¶ 5-12.

moved to partially dismiss the Amended Complaint. On December 10, 2014, the Court granted in part and denied in part Defendants' motion. The following are the surviving causes of action in the Amended Complaint: violation of the New Jersey Oppressed Minority Shareholders statute, N.J. Stat. Ann. 14A 12-7; unauthorized merger, in violation of N.J. Stat. Ann. 14A 10-1 *et seq.*; fraud; improper loans to a corporate officer/director, in violation of N.J. Stat. Ann. 14A 6-11; breach of fiduciary duty; corporate waste; violation of Plaintiffs' rights to inspect the books and records of FDC and FADS, under N.J. Stat. Ann. 14A 5-28; and violation of Plaintiffs' rights to an accounting of FDC and FADS' business activities. Am. Compl. ¶¶ 54-120.

After some initial discovery, on November 25, 2015, Plaintiffs moved to appoint a receiver for FDC, or alternatively, a special fiscal agent to supervise FDC's business. After a full briefing, on February 16, 2016, the Court held oral argument on the matter. Plaintiffs argue that the appointment of a receiver or a special fiscal agent during the pendency of this litigation is necessary to prevent Mr. Fimbel, Jr. from squandering, diminishing, or misappropriating the assets of FDC. Additionally, Plaintiffs claim that, in conformance with Defendants' alleged history of withholding information from shareholders, Defendants have not cooperated with Plaintiffs' discovery requests. Therefore, Plaintiffs argue that appointing a receiver or special fiscal agent is necessary to ensure that Plaintiffs' discovery requests are answered in good faith. Defendants counter that Mr. Fimbel, Jr. has not mismanaged the assets of FDC; that the transfers of assets from FDC to FADS were legitimate investment loans, legally secured by a promissory note; and that not only have Mr. Fimbel, Jr. and FDC always provided the legally required information to shareholders of FDC in the past, but that moreover, in the instant litigation, Defendants have complied with Plaintiffs' discovery requests. Defendants argue, therefore, that appointing a receiver or a special

3

fiscal agent is an extraordinary remedy that is inappropriate here, and risks causing more harm than good to FDC and its shareholders.

## II.    Evidentiary Standard

A trial court may appoint a receiver or special fiscal agent without an evidentiary hearing if "the record discloses sufficient facts to warrant appointment" of such. *Leone Indus. v. Assoc. Packaging, Inc.,* 795 F. Supp. 117, 120 n. 6 (D.N.J. 1992) (citing *United States v. Mansion House Ctr. N. Redevelop.*, 419 F. Supp. 85, 87 (E.D. Mo.1976)). Here, an evidentiary hearing is unnecessary because, as discussed *infra*, the record contains sufficient facts to merit the appointment of a receiver or special fiscal agent. Furthermore, neither party has requested such a hearing.

As an additional evidentiary issue, at the outset, Defendants have opposed the submission of the bulk of the evidence submitted by Plaintiffs in support of their motion, on the basis that such evidence is inadmissible hearsay. This evidence, all certified by Plaintiffs' counsel, includes FDC and FADS' tax records, email communications between the parties, minutes from shareholder meetings, and a preliminary memo produced by Plaintiffs' financial expert after examining the financial records of FDC and FADS. Most of this evidence (excluding the expert memo) was produced by Defendants during discovery, and Defendants do not dispute the documents' authenticity, simply their admissibility as hearsay.

Importantly, Defendants have cited to no cases excluding hearsay evidence from consideration on a motion to appoint receiver, but instead rely entirely on cases involving motions for summary judgement. Although "hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment," *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009), "temporary injunctions are customarily granted on the basis of procedures that are

4

less formal and evidence that is less complete than in a trial or at summary judgment, because there is no rule in the preliminary injunction context akin to the strict rules governing the form of affidavits that may be considered in summary judgment proceedings." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*, LLC, 793 F.3d 313, 325 (3d Cir. 2015) (quotations and citation omitted). Here, because Plaintiffs seek interim equitable relief, akin to a motion for preliminary injunction, the Court is not bound by the strict rules governing evidence at trial or summary judgement, and therefore, may consider the evidence presented by Plaintiffs. *See id.*

## III.    Analysis

Plaintiffs request that the Court appoint a receiver, to take control of FDC from Mr. Fimbel, Jr., and manage the company during the pendency of this litigation, or in the alternative, appoint a special fiscal agent to supervise FDC's business. As a preliminary issue, I note that district courts in the Third Circuit generally apply federal law to a motion to appoint receiver in federal diversity actions.[2] *See e.g. Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 610 (D.N.J.

---

[2] In *Hanna v. Plumer*, the Supreme Court stated that "[w]hen a situation is covered by one of the Federal Rules, . . . the court has been instructed to apply the Federal Rule," 380 U.S. 460, 471 (1965). Here, because Fed. R. Civ. P. 66 governs the appointment of receivers, it is appropriate to apply federal law. *See Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993); *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 842-843 (9th Cir. 2009); *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289 (11th Cir. 1998); *Minuteman*, 999 F. Supp. 2d at 816; *Stonebridge Bank*, 2011 WL 2173771, at *1; 12 Wright, Miller, Kane & Marcus, Federal Practice and Procedure, § 2983 ("Whether a federal court should appoint a receiver in a diversity action appears to be a question properly determined on the basis of federal law."); 13–66 Moore's Federal Practice–Civil § 66.09 ("Federal law and federal practice govern the appointment of a federal equity receiver. . . . [T]o use federal law is not inconsistent with the *Erie* doctrine . . . because the appointment of a receiver does not directly affect the outcome of the case. By definition, the appointment of a receiver is ancillary to the primary relief being sought, so the appointment of a receiver does not directly affect the outcome of a particular action."); *but see Troy Ventures*, 1994 WL 705411 at *8 (concluding that state law should apply, observing, "[c]ommentators have argued that, because Federal Rule of Civil Procedure 66 purports to govern the appointment of receivers, *Mintzer*[, a 1959 Third Circuit opinion applying state law to the appointment of a receiver,] is suspect in light of the opinion of the Supreme Court in *Hanna*. . .

2012); *Manufacturers & Traders Trust Co. v. Minuteman Spill Response, Inc.*, 999 F. Supp. 2d 805, 816 (W.D. Pa. 2013); *Kacmarski v. Eppehimer*, Civ. No. 1:13-07522, 2014 WL 7404538, at *2 (D.N.J. Dec. 30, 2014); *Stonebridge Bank v. Nita Properties*, LLC, Civ. No. 09-5145, 2011 WL 2173771, at *1 (D.N.J. June 1, 2011); *but see New England Mut. Life Ins. Co. v. Troy Ventures, Ltd.*, Civ. No. 94-3299, 1994 WL 705411, at *8 (D.N.J. Dec. 14, 1994). In their briefings, the parties rely on both federal and New Jersey law, and do not argue for the application of one or the other to this motion. Indeed, Defendants contend, and Plaintiffs do not dispute, that the state and federal standards on a motion to appoint receiver "do not appear substantially different." Defs.' Br. in Opp'n to Pls.' Mot. to Appoint Receiver ("Defs.' Opp'n Br.") 23. Thus, because the weight of authority in this circuit favors applying federal law, and because there is little difference between New Jersey and federal law on this issue, it is appropriate to apply federal law here.

Fed. R. Civ. P. 66[3] provides federal courts with the power to appoint a receiver in a pending litigation. *Stonebridge Bank,* 2011 WL 2173771, at *1. A trial court may grant a receivership if "the record discloses sufficient facts to warrant appointment of a receiver." *Leone,* 795 F. Supp. at 120 n. 6 (citing *Mansion House,* 419 F. Supp. at 87). However, the appointment of a temporary receiver is an extraordinary form of relief and should be granted only "in the face of compelling circumstances and in the absence of a less dramatic remedy." *Id.* at 120 (citing *Bracco v. Lackner,* 462 F. Supp. 436 (N.D. Cal. 1978)). "Because a receiver unquestionably interfere[s] with an

---

On the other hand, an analogy is possible between the appointment of a receiver to collect rents, and the assignment of rents, which is generally held to be controlled by state law.") (citations omitted).

[3] Fed. R. Civ. P. 66 states in pertinent part:
  These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule.

individual's right to otherwise control his or her property . . . a district court should appoint a receiver only in cases of necessity, and when the plaintiff clearly and satisfactorily shows that an emergency exists and the receiver is needed to protect the property interests of the plaintiff." *Minuteman*, 999 F. Supp. 2d at 816 (quotations and citations omitted).

Courts in the District of New Jersey uniformly require a party seeking receivership to demonstrate: (1) that she has "an equitable interest in the property to be seized or . . . judgments . . . cannot otherwise be satisfied," (2) that there is an "imminent danger of [the] property being lost, injured, diminished in value or squandered," and (3) "[that other] legal remedies are inadequate." *Stonebridge Bank*, 2011 WL 2173771, at *1 (quoting *Leone*, 795 F. Supp. at 120). Additionally, however, Defendants cite to *Minuteman*, a Western District of Pennsylvania case, which highlights nine equitable factors, compiled from the case law of multiple circuits,[4] which a district court may consider to determine whether it is appropriate to appoint a receiver. 999 F. Supp. 2d at 816-17 (citing *Comerica Bank v. State Petroleum Distributors, Inc.*, Civ. No. 3:08-678, 2008 WL 2550553, at *4 (M.D. Pa. June 2, 2008)). These nine factors are:

> (1) the probability of the plaintiff's success in the action;
> (2) the possibility of irreparable injury to the plaintiff's interests in the property;
> (3) the inadequacy of the security to satisfy the debt;
> (4) the probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim;
> (5) the financial position of the debtor;
> (6) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;
> (7) the inadequacy of available legal remedies;
> (8) the lack of a less drastic equitable remedy; and
> (9) the likelihood that appointing a receiver will do more harm than good.

---

[4] *See Consolidated Rail Corp. v. Fore River Ry.*, 861 F.2d 322, 326-27 (1st Cir.1988); *Mintzer*, 263 F.2d at 826; *Aviation Supply Co.*, 999 F.2d at 316-17; *Bookout v. Atlas Fin. Corp.*, 395 F.Supp. 1338, 1342 (N.D. Ga.1974), *aff'd*, 514 F.2d 757 (5th Cir.1975); *Brill & Harrington Invs. v. Vernon Sav. & Loan Ass'n*, 787 F.Supp. 250, 253-54 (D.D.C. 1992); *Comerica Bank*, 2008 WL 2550553, at *4.

*Id.* District courts in all three of Pennsylvania's federal districts have applied this nine-factor test. *See id.*; *U.S. Bank Nat. Ass'n v. Lighthouse Whitehall Commons, LLC*, Civ. No. 11-05054, 2012 WL 4473232, at *13 (E.D. Pa. Sept. 28, 2012); *Comerica Bank*, 2008 WL 2550553, at *4; *FirstMerit Bank, N.A. v. Myrter*, Civ. No. 2:15-333, 2015 WL 3916673, at *7 (W.D. Pa. June 25, 2015).

Clearly, there is significant overlap between the test applied by courts in the District of New Jersey and the test applied by district courts in Pennsylvania. Indeed, there is "no precise formula for determining whether a receiver [or special fiscal agent] should be appointed." *Minuteman*, 999 F. Supp. 2d at 816. Instead, it falls within the discretion of the court to consider the circumstances of each case and determine whether appointment of a receiver is appropriate. *Id.*; *Leone*, 795 F. Supp. at 120; *Stonebridge Bank*, 2011 WL 2173771, at *1. In light of the fact that courts in this district utilize the three-factor test, I will also use this test in my determination. However, because I find the elements of the nine-factor test helpful, I will consider them when appropriate in discussing the facts of this case.

I note that Plaintiffs, here, request that in the event that the Court finds appointing a receiver to be "too drastic," the Court instead appoint a special fiscal agent to oversee the affairs of FDC. Pls.' Supp. Br. at 17. Indeed, where the record shows that the court's intervention is necessary to protect a plaintiff's equitable interests during the pendency of a litigation, some courts opt to appoint a special fiscal agent, rather than a receiver, because a special fiscal agent is a "less dramatic" and "less intrusive device" than a receiver. *Leone,* 795 F. Supp. at 120; *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 560 (D.N.J. 1997) *aff'd. in part*, 148 F.3d 283 (3d Cir. 1998). It is preferable to appoint a special fiscal agent in those

8

circumstances where the plaintiffs' needs would be sufficiently protected by either remedy. *See In re Prudential,* 962 F. Supp. at 560*; Leone,* 795 F. Supp. at 120. However, as with receivers, federal courts are "reluctant to appoint fiscal agents" unless the record shows an equitable need for the appointment. *In re Prudential,* 962 F. Supp. at 560. For example, Defendants cite to *In re Prudential*, in which the court determined that it was inappropriate to appoint either a receiver or a special fiscal agent, because there was no evidence of "managerial problems" with the defendant's proposed class action settlement remediation program and there were already sufficient procedural safeguards integrated into the remediation program to protect class plaintiffs' interests. 962 F. Supp. at 560.

"Fiscal agents are generally appointed to monitor corporate record keeping or to prevent the erosion of assets on behalf of shareholders" or other plaintiffs. *Id.* For example, in *Republic of Philippines v. New York Land Co.*, the court appointed a "special property advisor," with full access to accounts, premises, and personnel of the real property in dispute, to advise the court on the propriety of expenditures and other transactions involving the properties. 852 F.2d 33 (2d Cir.1988). Similarly, in *Leone*, the court appointed a special fiscal agent to oversee the financial affairs of the defendant, who had a history of criminal RICO, to ensure compliance with the court's orders and to prevent transfer or dissipation of the defendant's assets. 795 F. Supp. at 120-121. Additionally, the court in *Ferguson v. Tabah* gave its appointed special fiscal agent even more broad powers than those of the courts in *Republic of Philippines* and *Ferguson* -- directing the special fiscal agent to oversee and pass upon all expenditures made by the defendant corporation. 288 F.2d 665, 670 (2d Cir. 1961).

In this case, I find that there is sufficient evidence in the record to demonstrate that Plaintiffs' property interests in FDC are in imminent danger of being lost, injured, diminished, or

squandered, and that the available legal remedies, other than the appointment of a fiscal agent, are inadequate to protect Plaintiffs' interests.

First, the parties do not dispute the fact that Plaintiffs, as shareholders in FDC, have equitable interests in the value of FDC's stock. Thus, any diminishment of FDC's assets will result in an immediate loss to Plaintiffs in the value of their stock.

Second, it is clear from the record that Plaintiffs' interests in FDC are in imminent danger of loss or diminishment. Since FADS' formation in 2004, FDC has been transferring assets to FADS or Mr. Fimbel, III in the form of cash, equipment, and workspace, without formalizing many of these transfers through loan agreements, notes, or leases. As evidence of these facts, Plaintiffs provide tax documentation and answers to interrogatories, which demonstrate that FDC has transferred substantial assets, e.g. funds and equipment, to FADS. *See* Cert. of Kristin V. Hayes ("Hayes Cert.") Ex. M. Defendants do not deny that such asset transfers from FDC and FADS have taken place. Rather, Mr. Fimbel, Jr. explains, in his certification, that FDC only allowed FADS to use "semi-obsolete equipment" and "excess empty space," and that because he believed "FADS had substantial potential" he directed FDC to loan money to FADS, and to Mr. Fimbel, III directly, as a business investment. Fimbel, Jr. Ver. at ¶¶ 20-26. Indeed, there is no dispute that since FADS' formation in 2004, FDC has repeatedly transferred funds to FADS, given or loaned equipment to FADS, and allowed FADS to use or lease FDC's facilities. *See* Fimbel, Jr. Ver. at ¶¶ 20-26. The question remains as to whether those transfers were appropriate business transactions.

Despite Plaintiffs' discovery requests for any notes or other documents related to the business dealings between FDC and FADS and other loans made to unknown FDC shareholders, prior to Plaintiffs' motion to appoint a receiver, Defendants provided no such documentation.

Certification of Lauren M. Derasmo. Indeed, Defendants for the first time, supplied a note evidencing a loan made to Mr. Fimbel, III (the "2012 Note"), as an exhibit to their brief in opposition to Plaintiffs' motion. *See* Fimbel, Jr. Ver. Ex. A. This sole note is dated 2012, and appears to be a forward-looking promissory note for loans of up to $1,000,000 to Mr. Fimbel III. *See* Fimbel, Jr. Ver. Ex. A. Accordingly, because the 2012 Note is forward looking, it cannot serve as documentation for any loans made to FADS or Mr. Fimbel, III, or any other FDC shareholder, prior to 2012. Thus, there appear to be no notes or loan agreements corresponding to over $1,000,000 in "loans to shareholders" that FDC reported on its tax returns between 2008 and 2011, *see* Hayes Supp. Cert. Ex. B, or the equipment and work space "loaned" to FADS. *See* Fimbel, Jr. Ver. at ¶¶ 20-26. Additionally, at oral argument, Defendants did not dispute that they had no notes or loan agreements memorializing an additional $300,000 in loans that were given by FDC to FADS between 2004 and 2006. Tr. of Oral Argument February 16, 2016 ("Tr.") 15. Tellingly, there is no evidence that these purported loans made to FADS and others were ever repaid, in part or in full. Because Defendants have failed to produce notes or other agreements evidencing these outstanding loans, the Court can only conclude that either (1) the loans were made to FADS and FDC shareholders without any controlling documentation, (2) FDC's accounts are in such a state of disarray that they have misplaced vital loan documents, or (3) Defendants have purposefully withheld such documents from Plaintiffs, in violation of discovery rules. Regardless of the reason, Defendants' failure to produce such critical documentation raises serious questions as to whether FDC's loans will ever be repaid.

Moreover, Defendants' attempt to explain this lack of documentation does not assuage the Court's concerns, but instead exacerbates them. At oral argument, by way of explanation, Defendants claimed that the $300,000 in loans given to FADS between 2004 and 2006 was meant

to be a gift, but because "corporations can't make gifts . . . it was shown on the books as a loan," and presumably never memorialized in a loan agreement. Tr. at 15-16. Defendants' characterization of the $300,000 loan as a "gift" creates substantial concerns for the Court, because it implies that FDC, and correspondingly, Mr. Fimbel, Jr., never intended or expected that FADS would repay this debt. Certainly, Defendants have not claimed that these "gifts" will be repaid with interest by FADS at some point in the future. And, moreover, even if FADS intended to reimburse FDC, FADS has been operating at a loss since its formation, Fimbel, Jr. Ver. at ¶ 45V, raising the question of whether it is capable of repaying the debt. Plainly, FDC's undocumented transfers to FADS directly threaten the property interests of Plaintiffs in their FDC shares. And, because FDC has indicated that it intends to continue to give FADS loans in the future, Hayes Cert. Ex. K; Hayes Supp. Cert. at Ex. D, H., Plaintiffs' interests in FDC are in imminent risk of further diminishment.

Another indicator of risk to Plaintiffs' interests, is the fact that the 2012 Note is entirely unsecured and is a personal loan to Mr. Fimbel, III, not FADS. *See* Fimbel, Jr. Ver. Ex. A. Thus, FDC is afforded very little protection if Mr. Fimbel, III defaults. Indeed, it is quite possible that Mr. Fimbel, III will not have the liquid assets necessary to repay the 2012 Note when it comes due, because according to Mr. Fimbel, Jr., he has invested "substantial amounts of his personal assets" in FADS. Fimbel, Jr. Ver. ¶ 21. To that point, Defendants counter, rather speculatively, that if Mr. Fimbel, III is unable to repay the loan, he can sell his shares in FDC to raise the necessary funds. However, this proposition is a more theoretical than real solution for a number of reasons. First, the 2012 Note does not specifically secure the loan with these shares, or indeed, any property owned by Mr. Fimbel, III. Second, Mr. Fimbel, Jr. has claimed in his answers to interrogatories that "FDC does not buy its own stock back." Hayes Supp. Cert. Ex. D. Thus, Mr.

Fimbel, III's ability to repay his debts to FDC may depend on finding another FDC shareholder, or a third-party, who is willing to purchase his shares. Additionally, if FDC continues to transfer its assets to FADS, by the time Mr. Fimbel, III's loan come due, FDC's assets may be so depleted that his shares will not be equivalent in value to his debts. Thus, I find that Mr. Fimbel, III's financial position is probative to the instant motion, because his lack of ability to repay his debts to FDC may have a significant impact on the value of FDC's stock, and correspondingly, Plaintiffs' interests in FDC.

Another issue that is probative for this Court is the likelihood of fraud. Plaintiffs provide tax documents demonstrating that since 2010, Mr. Fimbel, Jr. has been receiving a salary ranging from approximately $70,000 to $40,000 from FADS, in addition to his salary from FDC. Hayes Supp. Cert. Ex. I. However, in his certification, Mr. Fimbel, Jr. only claims that he receives a salary of $40,000 or $30,000 from FDC, and does not acknowledge that he also receives a salary from FADS. Fimbel, Jr. Ver. at ¶ 48. Indeed, in his answers to interrogatories, Mr. Fimbel, Jr. stated that "I have no specific relationship with FADS except as an interested bystander." Hayes Supp. Cert. Ex. D. When this discrepancy was raised during oral argument, Defendants explained that Mr. Fimbel, Jr. was not receiving a salary from both FDC and FADS, but rather to avoid having to pay a payroll servicing company, "FADS serves as the paying organization and then FADS is reimbursed by FDC." Tr. at 11-12. However, Defendants have not produced a written agreement governing the terms of this aspect of the business relationship between FDC and FADS. And, although Defendants stated that there were checks evidencing FDC's repayment to FADS for the salaries paid to FDC's employees -- which were not produced -- there is no formalized contractual agreement concerning FDC's hiring of FADS as a payroll service. Tr. at 11-12.

13

Thus, while at this stage it is premature to find that fraudulent conduct has occurred,[5] nonetheless, it is clear that, at the very least, FDC has been lax in its documentation and record-keeping duties. The Court finds it highly problematic that FDC uses FADS as a payroll service, going so far as to allow FADS to file tax documents claiming FDC's employees, and presumably the tax deductions for their income, as its own. Coupled with the undocumented transfers of assets from FDC to FADS, such behavior indicates that the boundaries between the two companies are porous at best, and nonexistent at worst. This creates a risk that a portion of FDC's assets may be inadvertently, if not purposefully, mislaid in FADS' books, at a direct cost to the value of Plaintiffs' shares in FDC.

Plaintiffs also argue that Mr. Fimbel, Jr., in recent years, has made a number of questionable business decisions, without shareholder approval, that demonstrate that Plaintiffs' interests in FDC are at risk of diminishment if Mr. Fimbel, Jr. is not replaced with a receiver. First, Plaintiffs provide tax documentation demonstrating that FDC has been operating at a loss almost every year since its approximately $1,000,000 investment in solar panels in 2010. Hayes Cert. Ex. A. Although Mr. Fimbel, Jr. admits in his certification that FDC experienced preliminary losses due to the purchase of the solar panels, he maintains that the solar panels were actually a "wonderful investment." Fimbel, Jr. Ver. at ¶ 45R. Mr. Fimbel, Jr. asserts that the solar panels are an investment that will begin to show returns within eight to ten years of purchase, and further, in the meantime, FDC's shareholders can report the losses on their tax returns, substantially reducing

---

[5] Troubling representations were made by Defendants at oral argument that raise serious concerns as to whether FDC committed tax fraud, a federal felony, by falsely reporting corporate "gifts" as loans, and whether FADS likewise committed tax fraud by falsely reporting salaries paid to FDC's employees as its own. However, because these issues were raised in oral argument, there is not sufficient evidence currently on the record to find that FDC or FADS committed tax fraud.

their taxes each year. Fimbel, Jr. Ver. at ¶ 45R. Moreover, according to Mr. Fimbel, Jr., "at the time of the investment, there were substantial government benefits afforded to those who invested in solar." Fimbel, Jr. Ver. at ¶ 45R. Mr. Fimbel, Jr. also denies that the solar panel purchase was "unsanctioned," stating that "all necessary corporate approvals were received." Fimbel, Jr. Ver. at ¶ 45R. Plaintiffs protest, however, that Defendants have failed to produce in discovery even "one document related to solar panels, their purchase, revenue creation, or otherwise." Pls.' Reply Br. in Supp. of Their Mot. to Appoint a Receiver ("Pls.' Reply Br.") at 11. Plaintiffs further assert that Mr. Fimbel, Jr.'s "unsupported and self-serving statement hardly is evidence of Fimbel's purported excellent management." Pls.' Reply Br. at 11. Neither party has submitted evidence regarding the corporate approvals necessary under FDC's charter or bylaws for such a purchase or evidence that such approvals were attained, other than Mr. Fimbel, Jr.'s self-serving general assurance that all necessary approvals were received.

Second, Plaintiffs assert that in 2012, FDC sold real estate in Whitehouse, New Jersey (the "Whitehouse Property") and asked for shareholder approval at the "last minute," denying FDC's shareholders sufficient time to make a considered decision. As evidence, Plaintiffs provide a series of emails between Plaintiffs, Mr. Fimbel, Jr., and other shareholders of FDC, in which Plaintiffs were asked to consent to the sale at the "llth hour." Hayes Cert. Ex. D. In his certification, Mr. Fimbel, Jr., does not dispute that the request for shareholder approval of the sale of the Whitehouse Property was made at the last minute, but he explains that the short deadline was not meant as a coercive tactic to induce shareholder approval. Fimbel, Jr. Ver. at ¶ 45I. Rather, Mr. Fimbel, Jr. explains that the timing of the request was the result of a last-minute closing demand by the purchaser's attorneys. Fimbel, Jr. Ver. at ¶ 45I.

15

The Court is not persuaded by Plaintiffs' arguments that FDC's investment in solar panels or the sale of the Whitehouse Property are indicative of catastrophic mismanagement of the company, sufficient to put their interests in FDC at imminent risk of loss. Simply put, there is not enough evidence on the record to demonstrate that these were objectively bad business decisions or that Mr. Fimbel, Jr. was acting in bad faith. On the other hand, however, it is undisputed that FDC has been generally operating at a loss since 2010, and that little or no documentation has been produced to show how these business decisions were made or whether the proper corporate formalities were honored.

In sum, the record contains ample evidence that it is necessary to appoint a special fiscal agent to protect Plaintiffs' interests in FDC. FDC's habit of making unsecured loans to FADS, Mr. Fimbel, III, and other stockholders, without formalizing these transfers through notes or loan agreements, clearly puts Plaintiffs' interest in FDC at risk, particularly since there is no evidence that these loans are being repaid. Furthermore, Defendants' characterization of some of these loans as "gifts" raises doubts as to whether FDC intended that they ever be repaid. Moreover, FDC's failure to maintain basic documentation of its transactions with FADS, indicates that Plaintiffs' interests are at risk of loss through neglect, at best, and through fraud, at worst. Finally, the questions surrounding the financial positions of FDC, FADS, and Mr. Fimbel, III, also sound the alarm regarding the security of Plaintiffs' interests. Therefore, I find that it is necessary to appoint a special fiscal agent during the pendency of this litigation to protect Plaintiffs' property interests in FDC.

While a receiver would certainly be capable of protecting Plaintiffs' interests in this matter, I find that appointing a special fiscal agent would be a sufficient and "less dramatic" alternative. *See Leone,* 795 F. Supp. at 120. The special fiscal agent will be empowered to audit FDC and track

16

the out-flow of its assets -- giving him or her the ability to alert the Court if it becomes necessary to impose a more drastic equitable remedy. Furthermore, there is an appreciable risk that a receiver, if appointed, would do more harm than good to FDC. Since FDC is a small, closely held company, any change in management will result in a loss of institutional knowledge, and may prevent the company from conducting business as usual. Conversely, there is little chance that a special fiscal agent will do more harm than good to the company, because the special fiscal agent's duties will be restricted to investigation, observation, and oversight. The Court anticipates that providing information to the special fiscal agent will not be a significant addition to the discovery costs that FDC has already undertaken in the instant litigation. And, such costs are greatly outweighed by the protections offered by the appointment of a special fiscal agent.

## IV.    Conclusion

In conclusion, the Court finds that to protect Plaintiffs' interests in their FDC stock, it is necessary to appoint a special fiscal agent to oversee the business affairs of the company. Accordingly, the Court will appoint a special fiscal agent and set out the details of his or her authority and responsibilities.

Date: April 7, 2016

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. District Judge

17